## JANUARY TERM, 1843.

### ROWAN AND HARRIS *v.* GEORGE W. ADAMS, *et al.*

Money paid upon an illegal consideration cannot be recovered back.

R. & H. introduced negroes into this State since the first of May, 1833, as merchandise and for sale, and sold them to H. G. R., and took in payment for them the notes of A., payable to H. G. R., and by H. G. R. indorsed, secured by mortgage on a tract of land ; held, upon this state of fact, that R. & H. were entitled to foreclose the mortgage given by A. and assigned in payment of the illegal consideration by H. G. R. to R. & H.

A vendee having purchased negroes, introduced into the State, in violation of the Constitution, cannot, in a court of equity, escape the payment of the purchase-money, without offering to surrender back the slaves and account for their hire.

Taking property in payment of a pre-existing debt, does not make the buyer a purchaser for valuable consideration, in the eye of the law, as against one holding a prior equity.

W., being about to purchase a tract of land, was informed that R. & H. had " *some sort of claim to it ;* " held that this was sufficient to put W. upon the inquiry.

THE brief of Messrs. Harrison and Holt presents a very full and detailed statement of the facts, exhibited by the pleadings in the cause.

*Harrison and Holt,* for complainants. It appears from the bill, that on the 7th of December, 1837, defendant George W. Adams being indebted to H. G. Runnells, in the sum of $26,034, made and delivered to him his three several promissory notes, for $8671·33⅓ each ; payable on the 1st of March, 1839, 1840, and 1841; and to secure their payment, executed to him a mortgage, conveying a tract of land, in the deed of mortgage and bill particularly described, which deed of mortgage was duly acknowledged and recorded in the proper county. Shortly after the execution of the deed of mortgage, Runnells assigned and delivered said three promissory notes to complainants, and in formal terms invested them with the right to control said mortgage.

The first of said notes, maturing 1st March, 1839, having been paid or settled, this bill was exhibited by complainants, as the holders of the remaining two notes, to foreclose the mortgage, and sell the land for their payment. George W. Adams, the drawer of the notes, was made a defendant, and he having since died, his unknown heirs have been brought before the Court on bill of revi-

vor, and the allegations of the bill have been taken *as confessed against them.* H. G. Runnells, who assigned the notes and mortgage to complainants, being also a defendant, has filed his answer, in which he protests against a decree in favor of complainants, on the ground, that the consideration of the transfer and delivery of the notes was the sale of slaves to him by complainants, which they had introduced into this State as merchandise, since 1st May, 1833. He makes his answer a cross-bill against complainants, and prays that his assignment of the notes may be vacated, and the notes decreed to be redelivered to him. He also alleges, that after having transferred the notes and mortgage, and consequently all his interest in the lands to complainants, he again sold the same lands to one John Watt, who, he insists, is entitled to hold them. He admits that the consideration upon which Adams executed the notes, was the sale to him by Runnells of these same lands, and that he (Runnells) conveyed the lands by regular and formal deed to Adams, by whom the deed was lost before it was recorded. Complainants pray, also, that this lost deed may be set up. They, by amended bill, make John Watt a defendant, alleging that when he purchased the lands, he was aware in law and fact of their interest in them, and bought subject to their mortgage. Watt, in his answer, admits that when he purchased of Runnells, he was informed by him, that complainants had some pretended claim to the lands, but was assured that the claim was unfounded, and that the sale made by Runnells to Adams had been cancelled. The information received was sufficient to put him upon inquiry, and that inquiry, if prosecuted, would have put him in possession of every fact now disclosed by the pleadings. The records of the county apprised him of the existence of the mortgage, and he must have known that complainants were the holders of the notes, for through them alone could they derive an interest in the lands, and he was bound to know that Runnells had no power to cancel his contract with Adams, after he had transferred the notes and mortgage.

Such being the aspect of the case, it seems to us that the only question worthy of attention, is that growing out of the "negro plea" of Runnells. He has sold the lands, twice, at enormous prices, and has *been twice paid for them,* and although he is but a

formal party to this suit, and no decree is sought against him, yet, as a mere *connoisseur* in matters of equity and conscience, he asks to be sustained in the receipt of this double payment, merely for the sake of the principle involved. It is true, that he is not without interest in the controversy, for if he can succeed in having the notes redelivered to him, and can then collect them of the estate of Adams, he will be *thrice paid for his lands,* once by Adams, once by complainants, and once by John Watt.

The heirs of Adams, knowing the consideration on which the notes were executed, to have been good and valuable, offer no resistance to the decree ; and it may be well doubted, whether they could do so, however much inclined, simply because the consideration of the assignment, with which they had no connection, was defective. But, whatever might be the right of Adams, we deny, utterly, that Runnells can be heard to make the defence which is urged in his answer. Universal as is the "negro plea," and fondly as it is hugged to the heart of the moral code of Mississippi, it has never been regarded as broad enough to cover the ground assumed in this case. Under the shelter of that plea, the citizens of the State have been protected in the enjoyment of thousands of slaves, imported from different portions of the republic without paying for them. But even among the most sanguine of the believers in the saving efficacy of this defence, it has never been supposed that it would enable the purchaser, who had paid for the slaves, to recover back the purchase-money, and hold the slaves, and the earnings of their labor also ; we can find no adjudged case recognizing such a principle. On the contrary, the law leaves parties thus circumstanced as it finds them.

Runnells *paid* the notes in question to complainants, for slaves which he purchased of them, without offering to return these slaves, or account for their value or hire : he now asks to recover back the very notes which he paid for them. If he can do this, money paid under like circumstances could be recovered back in this Court, and in a court of law. The principle is the same whether the payment be made in money, lands, or choses in action.

When Watt was informed by Runnells, that he had previously sold the lands to Adams, but that the contract with Adams was

subsequently cancelled, he knew that his informant had no interest in giving him correct information on the subject, and he should have made inquiry of Adams, or the holders of the notes, whoever they might be. This was a duty which he owed to the adversary claimant, and which, had he performed, he would have readily ascertained that Runnells had no right to sell. He entered into the contract blindly, regardless of others' rights, intent only on seizing this *tabula in naufragio*, from a bankrupt debtor. He might gain, but could not lose,— certainly he is not a *bonâ fide* purchaser for a valuable consideration, without notice. All this averment in regard to assurance given him by Runnells of the cancelment of the contract, is *new matter*, and is not proved. It is probable that this branch of the case might be properly pretermitted by the Chancellor, and that it would arise more legitimately in a subsequent suit between the purchaser of the mortgaged premises at a sale made by the commissioner, and John Watt, who, at the instance of the former, would, we think, be decreed to surrender his title.

*W. Yerger*, for H. G. Runnells. That the consideration of the indorsement was illegal and void, and the indorsement therefore void, has been repeatedly decided by the High Court. Reference is made to *Green v. Robinson*, 5 Howard, 80 ; *Glidewell et al. v. Hite*, 5 ib. 110 ; *Cowen v. Boyce*, 5 ib. 769.

It is a maxim in Equity, that " he who hath committed iniquity, shall not have equity." Fonblanque's Eq. 127.

Where parties are concerned in illegal agreements or other transactions, a court of equity will not interfere to grant any relief, nor give countenance to claims of the sort. 1 Story's Eq. 295, 296, and note (2).

These rules being applied, the bill of complainants, being an attempt to enforce the foreclosure of a mortgage, in furtherance of an illegal contract, will be dismissed.

*Montgomery and Boyd*, for defendant Watt.

By the CHANCELLOR. Runnells sold a tract of land to Adams, and made a deed thereto. Adams gave a mortgage to Runnells, on the same land, to secure the payment of the notes given for the purchase-money. The deed was not recorded, but was lost.

Rowan and Harris *v.* Adams, et al.

Runnells transferred the notes of Adams to the complainants, in consideration of the purchase of some negro slaves, introduced into this State in violation of the constitution. Runnells resists the foreclosure of the mortgage, by answer and cross-bill, upon the ground of the invalidity of the consideration of the transfer of the notes, and alleges as an excuse therefor that a number of the negroes were unsound. This defence is unavailable.

1. Because the notes were transferred, in *payment for the negroes.* To allow this relief would sanction the idea that money paid on such a consideration may be recovered back, in violation of the maxim, *in pari delicto melior est conditio defendentis.*

2. Because he does not offer to surrender back the slaves, and account for their hire, but merely says he is ready to do what is equitable in the case.

3. The illegality of the consideration for the transfer does not invalidate the mortgage, with which it has no connection.

It appears that after the transfer of the notes by Runnells to the complainants, he agreed to rescind the contract of sale with Adams, and then again sold the same land to the defendant Watt, in discharge of a pre-existing debt.

Watt's title cannot prevail against the mortgage, for two reasons.

1. Because he is not a *bonâ fide* purchaser for valuable consideration as against the complainants' prior equity ; he parted with neither money nor property, he advanced no new consideration, nor relinquished any pre-existing security for his debt ; taking property in payment of a precedent debt does not make the buyer a purchaser for valuable consideration in the eye of the law, as against one holding a prior equity.

2. He admits that Runnells informed him that the complainants had some sort of claim upon the land. He then had notice. It was his duty to have inquired into the character of this claim, when he would have learned its true character. The title to the land passed completely and perfectly, from Runnells to Adams, upon the execution and delivery of the deed, and the subsequent loss of that deed, in no way impaired the strength of that title, as between Adams and Runnells ; nor did the verbal cancellation, as I infer it

was, of the  contract of sale, divest Adams's title under the deed, or in any  way  affect  the  validity of  the  previously *executed*  and transferred  mortgage.    A  court  of  equity  would,  if  necessary  to perfect  the title to a  purchaser  under the  mortgage, compel  Runnells to  supply  the  place  of  the  lost  deed  by  making  a  new one.

Let the case be referred to the clerk to compute the amount of the mortgage-money, upon the report of which a final decree of foreclosure, dismissing the cross-bill, may be drawn.